Thank you for the oral argument. I appreciate the chance to advocate one more time for Mr. Oakes. Selfishly, I'm happy to be anywhere, frankly. This is the first in-person appearance I've done for a claimant since before the pandemic. It's like the old joke, glad to be anywhere. Your Honor, I note in the docket, description of the issue relates explicitly to the consultative examiner's examination and assessment in this case as it relates to his opinion about the claimant needing an assistive device. Obviously, I'm ready to present on that. I would like the Court to please consider that the argument that we had primarily made with respect to the ALJ's finding that this claimant can engage in the arduous requirements of medium work, which is standing and walking most of the day and lifting up to 50 pounds occasionally, that these really are part and parcel of the same argument and are based on the same facts. I especially want you to consider that even if the record were found wanting with respect to the assistive device issue, that does not mean that the ALJ's RFC finding is supported by substantial evidence. In other words, an assistive device certainly proves limitations in standing and walking and actually other limitations. Assistive device, you're talking about a cane or a walker? Yes, I'm sorry. Yes, Your Honor. But the absence of a cane... What's that issue? What is that? You said that you referred to the assistive device issue. Pardon me, Your Honor, just from the docket that was posted, the issue was stated as whether substantial evidence supports the ALJ's finding that the consultative examiner's opinion regarding the assistive device was supported by substantial evidence. And I would like, and I'm arguing hopefully clearly enough... As far as I understand it, the issue is whether the Social Security Administration properly denies your claim. Well, thank you, Your Honor. That was just the concern I had when I saw... I assume that might be that somebody looked at that and thought that was important. Well, thank you. I just wanted to clarify... I'm not saying what it is, but you go right ahead. Thank you, Your Honor. I just wanted to clarify that from the beginning because there really, you can find, theoretically, I think you should find for the claimant with respect to both issues, but you can find wanting the evidence regarding assistive device and still find on this record that the ALJ did not reasonably conclude that the claimant can stand and walk all day in a job. I'd like to address briefly, I hope, and maybe never again have to talk about this issue of reweighing the evidence that SSA repeats many times in its brief. I certainly understand that that's a tension in these kinds of judicial review related to Social Security decisions, but it's long been quite clear that two exceptions to quote, unquote, reweighing the evidence is when the ALJ has applied an improper standard in weighing the evidence and or when the findings themselves are unreasonable, illogical, or just not based on an accurate description of the evidence in the first place. And those are the linchpins of the claimant's arguments to this court. And I think it's hopefully helpful to hear again that there are numerous uncontested facts here. The claimant has very little treatment owing to the fact that he does not have insurance or money to pay for treatment, so the ALJ agreed that he needed to schedule a consultative examination. That was conducted and- The ALJ sent him to see a doctor, in other words. That's correct, Your Honor. Thank you. There was a hearing before the ALJ, correct, on his disability claim. Yes, sir. And before terminating the hearing, the ALJ decided to send him to the doctor, the consulting doctor. That's correct, Your Honor. This was on motion, repeated motion, I might add. The only evidence had been his testimony and records relating to emergency room visits? Yes, Your Honor, just a few. Two emergency room visits? That's right, two. Two emergency room visits several months before. It kind of boils down to this. He got the report and he disregarded it, and it looks like it's a situation that we have encountered many times before and bemoaned it, really. And that is to the tendency of an ALJ to overstate claimants' residual functional capacity and ability to work based on their daily activities. Is that the bottom line? This was certainly one of the rationales that the ALJ employed was a sort of general description of this claimant as, quote, unquote, being able to do things. What's wrong with that? Well, nothing if what those activities prove is that the claimant has a robust ability to perform activities all day long, every day. The issue in these cases is not what the claimant can do when they can do. It's what they can do day in, day out, five days a week, eight hours a day on a regular and continuous basis. And there's, of course, many cases that have noted that the claimant's ability to perform transitory or sporadic daily activities is not usually illustrative of what the claimant can do day in and day out. I might add that even taking that at one-to-one relationship, none of the activities that are relied upon by the ALJ in this case even remotely come to anywhere near a medium RFC of lifting 50 pounds. You know, washing some dishes or sweeping a floor. I think going to the grocery store was one of the items that was listed. None of these, even on their face, even if the claimant did them all day long every day, which, of course, not even the ALJ said that, would support a finding that the claimant can stand and walk all day and lift 50 pounds occasionally and 25 pounds frequently. But there was a little more than that, right? Didn't the doctor who assessed him assess generalized motor strength? There were some findings about upper extremities, lower extremities. Yes, Your Honor. I was just going to sort of launch into my little litany of what's in this report that's being described as inconsistent with Dr. Samia's conclusions. And what's in there is what you just mentioned about strength. I think very significantly the observation of a shuffling, limping, slow gait. So the doctor said five out of five for upper body strength, right? And four out of five for lower body strength? Correct. So that's not just daily activities, right? That's a doctor's report that he retains full strength in his upper extremities and close to full strength in his lower extremities. That's correct, Your Honor, although not entirely full strength. This is before we look at observations of the shuffling, limping, slow gait. The fact that the claimant supported his upper body in a seated position by resting himself on his arms. Decreased range of motion. Tenderness throughout the back. And then, of course, the finding itself regarding the need for an assistive device. Now, on this point, Dr. Samia used the phrase, appears to need the assistive device. Now, I think, and I'm sorry, and so this implies on numerous occasions in a sort of disparaging way that this isn't really much of an observation. But I submit that it wouldn't be if you or I made it, but if a doctor is making an assessment based on what he's seeing in the context of where he's already identified numerous other findings that are consistent with his report or assessment, I'm sorry, that what appears to a doctor is a far different thing than what appears to me or a judge or, frankly, an ALJ in one of these cases. And to go back, I would agree with Judge Floyd that what happened in this case primarily is that the ALJ, as you may recall from the briefs, when he finally agreed to schedule this consultative examination, in a case where the claimant couldn't afford treatment, therefore couldn't submit better evidence of his case, the judge indicated that we'll see what happens. Well, what happened was that a report was generated that patently contradicts the ALJ's findings in this case. I don't think there's even a dispute. A doctor's report. That's right, Your Honor. That patently contradicts the ALJ's RFC. I don't think there's a dispute here. A lot of energy has gone into defending the ALJ's decision to find it unpersuasive. But when you look at it from the standpoint of whether the correct standard is being applied to evaluating this evidence or when you apply the simplest test of just whether it's reasonable and whether it makes any sense logically or whether it accurately describes the evidence that is confronted in Dr. Semia's report, that the ALJ's decision does not come close to meeting even that more basic test. In one of these cases, and I'm sure the court has considered some cases involving the new opinion evidence rule, the opinion is only assessed initially for its persuasiveness based on whether it's consistent with the record and the opinion supported by the findings. And I've already shown that it did happen here. And the new opinion evidence rule did not attempt to or cannot in any way be twisted to have changed in any way, shape, or form. The standard of review that a district court applies, in fact, very explicitly to the contrary, SSA agrees that the ALJ's explanation still has to be supported reasonably in the record. It's plain that a doctor could look at what Dr. Semia looked at and reasonably come to the conclusions that he came to in this case. And all we have are, with all due respect, some made-up inconsistencies in the ALJ's rationale between examinations that occurred months and even over a year prior to Dr. Semia's report. And even none of that considers the fact that this minimal evidence was conducted in an emergency room, that this evaluation was performed by a disability examiner who SSA trains and, I imagine, supervises. Is the examining physician or the consulting physician, whatever you call him, is his report entitled more weight because he was selected by the Security Administration? No, Your Honor, I can't honestly say that. He is the only doctor that gave him a physician. The only doctor that assessed anything based on examination. In fact, the only doctor, period, because of this dearth of information in the record that's related to the claimant's financial situation, the initial reviewers at the state agency could not even conclude that there was enough evidence to make an assessment one way or the other. So that's the way that the case actually came before... The ALJ rejected Dr. Semia's... Yeah, well, found it unpersuasive, that's right. Found it unpersuasive. That's right. I mean, technically speaking, that's what the ALJ did here under... What did he say about this assistance device? Well, he found that it... Well, he employed... That's why I said these two overlap considerably. He applied essentially the same argument that it wasn't consistent with Dr. Semia's examination, but then also that it had not been prescribed. Now, that's an interesting, I would say even very unfortunate, looping that the ALJ is doing here. We don't have enough records because the claimant can't get treatment. We send him to a doctor. That doctor says he needs an assistive device, and now the ALJ's reaction to that is to say, well, he didn't have a prescription. Well, he didn't say prescription. He said he wasn't prescribed. Well, I'm not seeing the difference. Well, maybe there is no difference. Okay. I'm just trying to get the specifics. Well, I think SSA would have to agree that... If you read that, the absence of a written prescription for a walker or a cane, would this be for an assistance device? I'm happy to hear another theory. What was the prescription? What was it that wasn't prescribed? An assistive device. An assistance device. Right. So I'm happy to hear another theory about it, but I can't but conclude that the ALJ is invoking there, at least in part, not entirely, but in part the lack of a prescription. I don't think SSA will defend the proposition that you must have a prescription to demonstrate that a cane is medically necessary. What you actually need is an opinion, supported by evidence, that says that the cane is necessary, especially nowadays when anybody can go to Rite Aid or Walmart or whatever and just buy a cane out of a rack at a store. Now, that doesn't mean the claimant doesn't have the burden of showing that it's necessary, but it definitely leaves out of the equation more so than, let's say, 20, 30 years ago that you needed a cane for it to be considered legitimate. My time has run out. I'm obviously happy to consider. Yes, we're above time. Okay. Thank you, Your Honor. Any further questions? No. Thank you very much. Ms. McKay? Good morning, Your Honor. Good to have you with us, Ms. McKay. Thank you, Your Honor. May it please the Court, Natasha McKay, on behalf of the Acting Commissioner. The ALJ in this matter reasonably considered the evidence presented, 18 pages of medical records, and while the record is short, it is sufficient enough for the ALJ to make her determination. Over the three-year period in question, Mr. Oaks is seen by three medical professionals. The ALJ considered their observations and their findings. You're counting the two emergency room visits? That is correct, Your Honor. They are, in fact, medical professionals. They were what, almost a year before the consulting physician? That is correct, Your Honor. And then the consulting physician who the claimant was referred to by the ALJ? Yes, Your Honor. During the conduct of the hearing? Yes, Your Honor. Okay. The ALJ considered those observations and findings and included limitations in the RFC to accommodate Mr. Oaks' severe impairments and associated symptoms that were supported by the evidence presented. What was not supported was Dr. Samia's ultimate finding that Mr. Oaks required an assisted device for ambulation or for balance. It was not included because it was not supported. But he said he needed an assisted device to get around. Well, what Mr. . . . He said that to her, didn't he? He said that to the consulting physician. Well, what he says on page 255 of the record, Your Honor, or what was confirmed by Dr. Samia, is that Mr. Oaks confirmed that he was able to ambulate without an assisted device and able to walk a block. And at the onset of this case, Your Honor, Mr. Oaks is a fairly young individual. He's about 48 years old. He's alleging disability due to hypertension, to gout, to back pain. He's a cook. He's testified to that. He takes over-the-counter medication. He does not have a personal relationship with a primary care physician, and he has presented to the emergency room on two occasions to seek care. And what the evidence before us will show is that the ALJ's finding that Mr. Oaks did not require an assisted device for ambulation or for balance was reasonable. And here's why. Directing the Court's attention to page 237 of the administrative record. This is the first instance where Mr. Oaks presents to the emergency room. And if I may, normally when we present to the emergency room, we show up as our worst selves. We're saying, I am in need of urgent care, help me, this is an emergency. Mr. Oaks presents to this first emergency room visit. He complains of back pain, radiating pain, moving down his leg. His examiner in that instance indicates that Mr. Oaks is able to ambulate. Nowhere in that record does it show that Mr. Oaks presented with an assisted device for ambulation or for balance. In fact, the examiner indicates that Mr. Oaks demonstrates normal gait, his manner of walking, normal motor strength, full range of motion, no neurological deficits. Then we have the December 2018 emergency room record. Those are on page 246 of the administrative record. Mr. Oaks presents again as what we believe is his worst self. And nowhere in those records is it indicated that Mr. Oaks presents with an assisted device for ambulation or for balance. In fact, he was examined by a physician of internal medicine, Dr. Parikh, who indicated that Mr. Oaks demonstrated normal strength, normal range of motion, no indication that he presented with an assisted device for ambulation or for balance. And then we have... I thought Dr. Simeon, I have my notes, that his report concluded that folks may have difficulty with rough and uneven surfaces. And in keeping with the report that he used, quote, both a cane and a walker at home, unquote, and it appears an assistive device is needed for both ambulation or balance. Or that makes sense with the both. And that's an unquote. And I'm quoting from the report of Dr. Simeon. The consulting physician wrote that. Yes, Your Honor. Yes, Your Honor. And the ALJ didn't accept that. Well, Your Honor, before that, what I was discussing, there's two answers to that. But he says that Oaks reported to him that he used both a cane and a walker at home and that it does appear an assistive device is needed for both ambulation or balance. Now, that's what he said. Yes. Okay. But prior to that, Mr. Oaks was seen by Dr. I thought you said there was no evidence of any of that. No, Your Honor. Prior to that, Mr. Oaks was seen by. That's what Oaks said, but that's what the doctor said. Well, what Mr. Oaks said at Dr. Simeon's, while he was observed by Dr. Simeon, what he concluded or what he confirmed was that he was able to walk without an assistive device. That's what Mr. Oaks confirmed on page 255. Well, he reported that he used a cane and a walker at home. That's in the quote of the doctor. He used a cane and a walker at home. And it does appear an assistive device is needed. But it says none was prescribed. And I don't understand what that means. Does that mean a prescription? Or does that mean required or needed or something? Does it mean something other than prescribed? No, Your Honor. It doesn't mean that a prescription is required. And certainly it is not what the ALJ was doing. But the ALJ said, as a matter of evidence, I think, there was no prescription. There was no assistive device prescribed by Dr. Simeon. Is the way I was reading it. Yes, Your Honor. Is that correct reading on my part? Well, what it does not mean is that a prescriptive device was required. The ALJ was. No, he said a prescription was not prepared. Yes. Prescriptions, I think of that as where I'm going to go to the drugstore or the medical supply store and pick up a walker or a cane. Is that right? Well, Your Honor, what was happening? There was none written by Dr. Simeon. And there did not need to be, Your Honor. I'm just trying to ascertain the facts. That's your position. It did not need to be. He didn't need to have a prescription written. Yes, Your Honor. All right. You say that because he didn't need a walker or a cane? There isn't a requirement that a prescription. Well, the doctor said it appears he needed an assistive device for ambulation and balance. Yes. Well. But even there, Your Honor, where that was noted, even in that examination where Mr. Oaks was found to be leaning over on the examination table or presented with what was called a shuffling gait, even there in that examination, the first one where Mr. Oaks actually presents with an assistive device, even there he confirms that he could ambulate without it. And that is on page 255 of the record. And that's also stated by Dr. Simeon as well. So what the ALJ was doing in that instance was giving a balance review of the evidence and showing why her consideration of the evidence and her findings in the RFC were reasonable. How often do the ALJs reject the medical reports of their own doctor? Well, there are two answers to that. First, the consultative evaluation, the CEs, they're not our own doctors. They are not employees of the agency. They are independent evaluators. They're not all doctors? They're not our, they're not agency. Yes, they are not agency. They are doctors. They are, yes. They are medical professionals. Yes, yes, Your Honor. And the ALJ is not a medical professional. I'm sorry, Your Honor. The ALJ is not a medical professional. Correct, Your Honor. ALJ is a lawyer. Correct, Your Honor. I suspect. Yes. All right. Go ahead. So here we are where. We got a lawyer rejecting the medical evaluation of a trained physician. Not rejected. Which we have here. And the only one that's performed a physical examination on this fellow. Well, first, the ALJ did not reject the opinion entirely. One facet of the opinion, the use of an assistive device for ambulation, and again, that was not adopted because it was not supported. However, there were other. That's the only thing that was rejected? Well, that's the only limitation that was provided. That's the only thing that was rejected in the whole report? Yes, Your Honor. That's the only limitation that was actually provided. It appears that Mr. Oaks requires an assistive device for ambulation and for balance. That is the only limitation provided by Dr. Samir. That's the first part. The second part is he is not the only examining physician in the record. Dr. Parikh examined Mr. Oaks in December of 2018 in the emergency room. He is a doctor of internal medicine and still a doctor. So the indication by our opposing counsel that there was only one physician in the record is simply not accurate. He was seen by other medical professionals. And their opinion. The only other two times he'd been seen a doctor was almost a year earlier in the emergency room. May of 2018, December of 2018, and then the CE in September of 2019. There isn't a lot of evidence, but what's here is sufficient enough for the ALJ to make her determination. Does the regulation allow the ALJ to give controlling weight to a doctor's opinion? Any doctor's opinion? Well, we are operating under the new regulation. So we're not operating regarding weight. But the regulation forbids the ALJ from giving controlling weight to any medical professional's opinion, right? The regulation requires the ALJ to assess the persuasiveness of the opinion, right? Supportability, consistency, et cetera. Correct, Your Honor. The ALJ can't say, you're a doctor, you know what you're doing, I'm not a doctor, end of story. Exactly, Your Honor. So the question then, the ultimate question is... They got to explain it when they reject it. Yes, but again, only one facet of the opinion was rejected. There's only one limitation noted. And as we can see throughout the record, there's not enough support for an assisted device. And even if a review in court would have weighed the evidence differently, even if a review in court would have determined the evidence differently, it's not the job of the review in court. The task of resolving conflicts in the evidence is that of the ALJ. And as we can see, the district court affirmed the commissioner's findings and found that there was substantial evidence to support the ALJ's RFC. And so here as well, we're asking for these reasons that the honorable court affirm the district court's judgment. Thank you. Any other questions? Thank you, Ms. McKay. Thank you, Your Honor. Mr. Oosterhout. Thank you. Just a few comments, and to start at the end. I mean, the idea that the issue in this case is whether the claimant needs a cane or can just stand and walk just fine is just not an accurate statement of the evidence that was before the ALJ. The claimant described very significant standing and walking limitations during his testimony that is supported in Dr. Samia's assessment. It appeared to him as a doctor that the claimant needed to use this cane that he was describing. I don't read personally Dr. Samia's report as suggesting that the claimant always needs it. In fact, quite clearly in context, he didn't have it with him that day. We spent way too much time talking about this cane. He applied for disability benefits. Yes, sir. And the question is what capacity does he have to perform work? That's right. And I guess the only reason the cane comes into effect, in order to do things during the day at the job, he'd have to have a cane. But forget that. The question is, was he disabled? Right. And so here the item for review is the ALJ's finding, well two really, that the RFC finding itself for medium work, which as you probably know, is basically standing and walking all day or most of the day while lifting 50 pounds occasionally and 25 pounds frequently. So that's the RFC that's at issue. That RFC is not supported by the opinion that the claimant needs to use a handheld assistive device to move about, even if only occasionally. And it's certainly not consistent with the claimant's self-description of his limitations, which I agree with you, Judge Floyd, we didn't talk about enough today. The claimant's description of his symptoms and limitations must be credited, if it's number one, if it's generally consistent with the types of medical conditions that the claimant has, and that's a given in this case because the ALJ found as such. And then in the second part of the test under 404.15.29, the issue is whether the claimant's subjective complaints are consistent with the record in a more general way, but it is not the same. When you're arguing the claimant's self-described limitations at Step 2 of 404.15.29, it is not the same as saying that we're arguing for disability based on subjective complaints alone. That's already been dispensed with by the Step 1 finding. So at Step 2 we consider everything. In fact, the ALJ gave surface attention to all of these. He rejected Dr. Samia's contrary opinions, we argue, for illogical and unreasonable reasons. He made a big show of the claimant's supposedly robust daily activities as being inconsistent, I'm sorry, as being consistent with a finding that the claimant can't perform medium work. And then, and it happened again in the presentation today, we keep looping back around to the lack of medical evidence in this case as supporting the ALJ's decision when the whole case arises as a result that the ALJ even acknowledged that the claimant wasn't able to get treatment. And so he's not had the kind of treatment that we've seen in lots of cases. That's absolutely true. That's a given. And so we're left in this case with the only full evaluation of the claimant's limitations. And I might add, in other contexts, SSA will emphasize that these doctors aren't just sort of independent and we don't really have much to do with them. That's not true at all. They're under contract and they're trained. And in other contexts they will argue that they're trained in disability evaluation and that they're experts in Social Security's programs. And that's true. That's what the regulations say. So that's the context in which Dr. Samia sees Mr. Oaks. Are you saying Dr. Samia should be given more weight than the ER doctor? Well, okay, yes, but not for quite the reason that I think you picked up on. Your Honor, number one, there's no question whatsoever that Dr. Samia's evaluation was more complete in the sense that he discussed a lot more things. And you might note that nothing SSA has said yet, here today or in its briefs, directly challenged what Dr. Samia found, what he saw. They're not saying that he didn't see what he saw. They're saying that somebody else saw something different 15, 16 months earlier than Dr. Samia's examination. That could very well be true. Because don't forget, the primary condition in this case is degenerative disc disease. Well, you take degenerative plus time, and the most reasonable thing to conclude from that is that it's very possible that in two years before the hearing at an emergency room visit that the guy had much less problems than he had several years later when Dr. Samia saw him. I think that's a perfectly reasonable conclusion to draw. But that's not what the judge did. The judge really is reversing the whole thing. He's saying, kind of almost putting Dr. Samia's opinion in the hot seat from the beginning as an assumption and then comparing the inconsistent statements from previous to it. But you could just as easily do it the opposite. You could just as easily put the May 2018 emergency room doctor in the hot seat and then argue that Dr. Samia's opinion contradicts it. The point is that the only reasonable conclusion is that with a degenerative condition and the claimant getting older, by the way, he had passed age 50 during the pendency of this case, that the more significant limitations that Dr. Samia found are based on the training that Dr. Samia has by SSA. Can I ask you about that? You mentioned Dr. Samia's training. Yes. Previously, that he's trained to assess for this purpose. And you just mentioned limitations. Should we read the doctor's opinion, the doctor's evaluation as setting out the universe of limitations? The government pointed out that the only limitation in Dr. Samia's opinion was that he may need a cane and may have trouble with inclines or stairs. Is that the universe of potential limitations? Is it significant that the doctor didn't say he can't lift over a certain amount? I'm not sure. Yes. I meant to try to pick what to talk about in a short period of time. Yes. I won't say that Dr. Samia's opinion necessarily covered everything that I wished that it would have. I wasn't the rep at the administrative level. There might have been a way to get more information from Dr. Samia, but that didn't happen. My question is not just was Dr. Samia's opinion the ideal for you, but when the ALJ is assessing what limitations are necessary, can the ALJ read the doctor's opinion and say, the doctor didn't say that this man has a lifting limitation. No, he didn't. But it sounds like, based on all the evidence, that that might be appropriate. Or are we just looking at the only limitations that this doctor, who's trained to find limitations, found was may need a cane occasionally or may have trouble with inclines? Is that the universe of limitations? No. In fact, that was the first thing that I tried to address when I got back up, which is that you can't think about someone who needs a cane who can just walk. The choice isn't between whether he needs a cane or whether he can walk as much as he wants to. There's clearly something implied here. And there's also the fact that the ALJ also made a finding in this case that the claimant's testimony was not credible, I guess is the word that we have to use in these cases, even though that's not technically correct. And so a credibility finding has to take into account all the evidence. And all the evidence included in this case, Dr. Sameha's opinion, which absolutely is consistent with the claimant's self-description of standing and walking limitations. So I didn't mean to answer your question as to what I had wished for. I was trying to answer that, ideally, I think even Social Security would say that you get sort of an item-by-item description of limitations across a broad range of work-related functions. But that didn't happen here. That's absolutely true. Thank you very much. Thank you, Your Honor. Good to have you here. Thank you. I appreciate counsel's arguments very much. And if we could do so, a procedure here normally is we come down from the bench at this point and shake hands with the lawyers and reach in and tell you you've done a fine job. We've suspended those rules for them. Well, I remember that from several years ago. I was sort of hoping that you'd gotten back to it, but it certainly understood why. You've been there for the pandemic, but next time. All right. Thank you, sir. We'll do that. Good to have you here. Mr. Clark, we'll adjourn court until tomorrow. This honorable court stands adjourned until tomorrow morning at 930. Godspeed to the United States and this honorable court.
judges: Robert B. King, Allison J. Rushing, Henry F. Floyd